IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

IN THE MATTER OF THE SEARCH OF )     Case No.
HONDA ACCORD                    )
VA LICENSE NUMBER JUR5020       )
VIN – 1HGCM66595A053631         )     UNDER SEAL

AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

I, Cynthia Paige Pinson, being duly sworn and deposed, state the following:

**A.    Introduction**

1.    I have been a Special Agent with the Federal Bureau of Investigation (FBI) for over

three years. I have investigated numerous intellectual property crimes. I am currently assigned to

the Washington Field Office Computer Crimes Squad. Our squad's primary mission is to investigate

both intellectual property crimes and crimes utilizing the exploitation of emerging technologies to

defraud United States industries and consumers. I have received training in general law enforcement

and in specialized areas including computer, intellectual property and other white-collar crimes. In

addition, I hold a Bachelors degree in industrial engineering from the Georgia Institute of

Technology (Georgia Tech) and a Masters degree in business administration from Georgia State

University. I have worked with the computer security center within Georgia Tech, and I have taught

numerous courses involving internet software.

2.    The facts set forth in this affidavit are based upon my own personal knowledge;

knowledge obtained from other individuals, including law enforcement officers and industry

representatives; my review or the review by other law enforcement officers of documents and of

audio and video recordings of undercover law enforcement activities related to this investigation;

communications with others who have personal knowledge of the events and circumstances

described herein; consultations with technical experts both in law enforcement and industry; and information gained through my training and experience. Among the industry experts consulted during this investigation is Blazer Investigations whose private investigators have received extensive training from the manufacturers of trademarked goods, including Louis Vuitton, Gucci America, Inc, Burberry of England, Kate Spade, and Coach, in the recognition of counterfeit goods and who have experience assisting the FBI, United States Customs, and State and local police agencies in the detection of counterfeit goods. Because this affidavit is submitted for the limited purpose of establishing probable cause in support of the application for a search warrant, it does not set forth each and every fact that I or others have learned during the course of this investigation.

3.    I make this affidavit in support of an application by the United States of America for the issuance of a warrant to search a vehicle described as a Honda Accord, Virginia license plate number JUR5020, Vehicle Identification Number 1HGCM66595A053631, as described in Attachment A of this affidavit, hereby incorporated by reference, for the items described in Attachment B of this affidavit, hereby also incorporated by reference, which constitute evidence, contraband, fruits, or instrumentalities of violations of criminal conspiracy and counterfeit goods trafficking laws, namely, Title 18, United States Code, Sections 371 and 2320.

**B.    Background**

4.    In December 2004 the Spotsylvania County Sheriff's Office, in Spotsylvania, Virginia, executed search warrants on two locations suspected of trafficking in counterfeit products. Seized during execution of the search warrants was over $150,000 in retail value of counterfeit purses and wearing apparel. During the search of one of the locations, business and financial records were uncovered linking the illegal Virginia based activity to businesses located in the 1300 block

2

of 4th Street, N.E., Washington, D.C.

5.      In January 2005 a Detective with the Metropolitan Police Department in Washington,

D.C., who often works in an undercover capacity (hereafter "UC"), was contacted by Mr. Edward

J. Doyle, Director of the Financial Crime Intelligence Center, Virginia Attorney General's Office,

regarding the investigation of businesses trafficking in counterfeit goods in the 1300 block of 4th

Street, N.E., Washington, D.C. Mr. Edward J. Doyle has been the Director of the Financial Crime

Intelligence Center for the Office of the Attorney General of Virginia since June 2002. Mr. Doyle

is also a sworn Auxiliary Deputy Sheriff with the rank of Detective with the Spotsylvania County

Sheriff's Office. Prior to his current employment, Mr. Doyle was employed by the U.S. Department

of the Treasury's Financial Crime Enforcement Network (FinCEN), the U.S. Central Intelligence

Agency, the Illinois Department of Law Enforcement's Division of Criminal Investigation, and the

Illinois Legislative Investigating Commission. He has over 35 years of experience in organized

crime and drug related law enforcement and intelligence work; has participated in, conducted, and

directly or indirectly supervised over 1,500 criminal investigations relating to money laundering; and

has participated in over 15 counterfeit trademark cases.

6.      From January 2005 through the present, UC, Detective Doyle, other members of the

Washington DC Metropolitan Police Department's Major Narcotics Unit, Major Case Squad, your

affiant, and other Agents from the FBI, conducted an investigation relating to the sale of counterfeit

products by WAZIR MARBLE AND GENERAL MERCHANDISE, located at 1329 4th Street, N.E.,

Washington, D.C., in violation of Title 18, United States Code, Sections 371 and 2320. According

to Virginia State Corporation Commission Records, the Directors of this company include ISMAEL

WAZIRY and Shah Waziry who both reside at 7437 Dulany Drive, McLean, Virginia. The

investigation included surveillance of the premises and undercover purchases from the business. On

November 10, 2005, law enforcement officials from various Federal and State agencies executed a

federal search warrant upon the premises of WAZIR MARBLE AND GENERAL MERCHANDISE,

1329 4th Street, N.E., Washington, D.C., and seized thousands of goods bearing counterfeit marks,

that is, spurious marks which are identical with, or substantially indistinguishable from, marks that

are registered for those goods on the principal register in the United States Patent and Trademark

Office and are in use, in violation of Title 18, United States Code, Section 2320. Simultaneously,

Agents executed a federal search warrant upon the residential premises of ISMAEL WAZIRY,

QUDRAT WAZIRY, and ABDUL JALIL WAZIRY, the owner and principle employees of WAZIR

MARBLE AND GENERAL MERCHANDISE, at 7437 Dulany Drive, McLean, Virginia, and seized

large quantities of counterfeit goods and more than $30,000 in cash from the residence. Based upon

this investigation, it is clear that the managers and employees of WAZIR MARBLE AND

GENERAL MERCHANDISE at 1329 4th Street, N.E., Washington, D.C., engaged in the commercial

sale of counterfeit products to members of the public.

### C.    Relevant Code Sections

7.    Title 18, United States Code, Sections 371 and 2320 provide in pertinent part:

Section 371:
If two or more persons conspire ... to commit any offense against the United States
... and one or more of such persons do any act to effect the object of the conspiracy,
each shall be fined under this title or imprisoned not more than five years, or both.

Section 2320:
**(a)**    Whoever intentionally traffics or attempts to traffic in goods or services and
knowingly uses a counterfeit mark on or in connection with such goods or services
shall, if an individual, be fined not more than $2,000,000 or imprisoned not more
than 10 years, or both, and, if a person other than an individual, be fined not more
than $5,000,000.

4

**(b)**    Upon a determination by a preponderance of the evidence that any articles in the possession of a defendant in a prosecution under this section bear counterfeit marks, the United States may obtain an order for the destruction of such articles.

**... (e)**    For the purposes of this section –
　　　　**(1)**    the term "counterfeit mark" means –
　　　　　　**(A)**    a spurious mark
　　　　　　　　**(i)**    that is used in connection with trafficking in goods or services;
　　　　　　　　**(ii)**    that is identical with, or substantially indistinguishable from, a mark registered for those goods or services on the principal register in the United States Patent and Trademark Office and in use, whether or not the defendant knew such mark was so registered; and
　　　　　　　　**(iii)**    the use of which is likely to cause confusion, to cause mistake, or to deceive. . . .
　　　　**(2)**    the term "traffic" means transport, transfer, or otherwise dispose of, to another, as consideration for anything of value, or make or obtain control of with intent to so transport, transfer, or dispose of. . . .

**D.    The Investigation**

　　　　**1.    January 26, 2005, Undercover Purchase**

8.    On January 26, 2005, acting on information that businesses located in the 1300 block of 4th Street, N.E., Washington, D.C., were trafficking in counterfeit handbags, UC proceeded to Washington Perfume and Watch Center, also doing business as WAZIR MARBLE AND GENERAL MERCHANDISE, located at 1345 4th Street, N.E., Washington, D.C., to purchase counterfeit handbags. UC engaged in a conversation with an unidentified man ("UM"), asking him if they had any brand name - meaning counterfeit - pocketbooks for sale. UM told UC that she would have to go to "our other" store five doors down, WAZIR MARBLE AND GENERAL MERCHANDISE, located at 1329 4th Street, N.E., Washington, D.C.

9.    UC then proceeded to 1329 4th Street, N.E., location of WAZIR MARBLE AND GENERAL MERCHANDISE.  Once inside, UC engaged in a conversation with two males,

subsequently identified as ISMAEL WAZIRY and QUDRAT WAZIRY. QUDRAT WAZIRY assisted UC in selecting seven counterfeit handbags, two Coach, one Gucci, one Chanel, two Prada, and one Louis Vuitton, along with two counterfeit Gucci wallets, for purchase. UC paid ISMAEL WAZIRY $168 in MPD funds and was given a receipt for the items. All items purchased during this undercover visit were later inspected by a private investigator from Blazer Investigations and found to bear counterfeit marks, that is, spurious marks which are identical with, or substantially indistinguishable from, marks that are registered for those goods on the principal register in the United States Patent and Trademark Office and are in use, in violation of Title 18, United States Code, Section 2320.

### 2.    April 25, 2005, Undercover Purchase

10.    On April 25, 2005, UC, along with a Cooperating Witness (CW), proceeded to WAZIR MARBLE AND GENERAL MERCHANDISE, 1329 4th Street, N.E., Washington, D.C., for the purpose of purchasing counterfeit products again. Upon entry, UC and the CW were met by ISMAEL WAZIRY. The CW greeted ISMAEL WAZIRY and told him the CW and UC were looking for some handbags. ISMAEL WAZIRY spoke in Farsi to another man, subsequently identified as QUDRAT WAZIRY, who was conducting business behind the counter. QUDRAT WAZIRY then directed the CW and UC to follow him into the back of the store.

11.    UC and CW proceeded to a storage room in the back of the store where QUDRAT WAZIRY displayed counterfeit handbags bearing spurious, federally registered trademarks of Louis Vuitton, Coach, Gucci, Prada and Burberry. UC noted there were several hundred handbags both in boxes and stacked loosely throughout the storage room. QUDRAT WAZIRY told UC that the Louis Vuitton purses would cost $26 but that if they bought several pieces he would only charge $25.

QUDRAT WAZIRY said the Prada and Gucci bags were $18 apiece and that Coach bags were $22 and Coach fabric bags were $25.

12.    QUDRAT WAZIRY showed UC and the CW several models and styles of counterfeit purses, each bearing what appeared to be a counterfeit trademark logo or design, and he explained which brands were the best sellers. UC and the CW selected several counterfeit bags for purchase and then proceeded with QUDRAT WAZIRY up to the front of the store. UC noted that handbags bearing what appeared to be counterfeit trademark logos and designs were displayed not only along the wall of the store, but also in open boxes in the aisle. Also displayed in the store were shoes, belts, hats and other apparel bearing what appeared to be counterfeit trademark designs and logos.

13.    Once at the front counter, QUDRAT WAZIRY displayed counterfeit wallets along with counterfeit Fendi and Christian Dior purses, stating the purses would cost $35 each. When asked how much UC could charge for the purses, QUDRAT WAZIRY stated for the $18 purse UC could charge $65, adding that one of his customers charges several hundred dollars for a $26 counterfeit Louis Vuitton purse. QUDRAT WAZIRY then added up the sale, computing the cost on a calculator and writing a receipt. During this time, ISMAEL WAZIRY was standing in back of UC and the CW, facing the counter, while talking on a cell phone. UC paid QUDRAT WAZIRY $228 in MPD funds for the handbags, as well as wallets, bearing counterfeit reproductions of federally registered trademarks, specifically Louis Vuitton, Coach, Prada, Gucci, Fendi and Christian Dior. QUDRAT WAZIRY put the money in his pocket. After the transaction, QUDRAT WAZIRY wrote his name on a business card which he presented to UC along with the receipt for the purchase. All items purchased during this undercover visit were later inspected by a private investigator from Blazer Investigations and found to bear counterfeit marks, that is, spurious marks which are identical

7

with, or substantially indistinguishable from, marks that are registered for those goods on the principal register in the United States Patent and Trademark Office and are in use, in violation of Title 18, United States Code, Section 2320.

### 3.    May 12, 2005, Undercover Purchase

14.    On May 12, 2005, UC and the CW entered WAZIR MARBLE AND GENERAL MERCHANDISE, 1329 4th Street, NE, Washington, D.C., for the purpose of purchasing counterfeit products again.  UC and the CW were greeted by ISMAEL WAZIRY and were approached by an individual who later identified himself as "Abdul," subsequently identified as ABDUL JALIL WAZIRY.  In the presence of UC, the CW told ABDUL JALIL WAZIRY that he and UC wanted to buy some purses, including Louis Vuitton, Channel, Prada, Fendi and Coach.  ABDUL JALIL WAZIRY directed UC and the CW to a room located at the back of the store.

15.    Once in the back, ABDUL JALIL WAZIRY displayed several purses bearing counterfeit trademarks, including counterfeit Gucci, Coach, Prada and Louis Vuitton purses. ABDUL JALIL WAZIRY told UC to select what UC wanted.  After some review of the merchandise, UC asked where QUDRAT WAZIRY was, adding that UC had done business with him before and that he had given UC a good price on purchases.  QUDRAT WAZIRY then approached UC and the CW and provided UC with what appeared to be a catalogue for Louis Vuitton products. QUDRAT WAZIRY told UC to pick out what products she wanted and it would take him about 10 to 15 minutes to return with her order.  UC selected eight items from the catalogue which QUDRAT WAZIRY copied down on a piece of paper.  QUDRAT WAZIRY told UC that the purchase price for the eight items would be $200, said he would be back in 10 minutes, and exited from view.

16.    UC notified surveillance units via her cell phone to be on the lookout for a male with

8

dark hair, wearing a checked shirt, who may have exited the store from a rear door.  At that time,

Detective Doyle observed a man, later identified as QUDRAT WAZIRY, wearing a plaid shirt

walking from the vicinity of the rear of WAZIR MARBLE AND GENERAL MERCHANDISE, up

an alley, past a truck unloading merchandise into the rear of another business.  QUDRAT WAZIRY,

who was holding a piece of paper in his hands, proceeded to a metal garage type door located at the

rear of Washington Perfume and Watch Company, 1345 4th St. N.E., Washington, D.C.  The grey

steel door has the number "2" written in white on the door.  The door was locked with a padlock

located on the right side.  Detective Doyle observed QUDRAT WAZIRY open the lock, raise the

door, and enter what appeared to be a storage facility.

      17.    Moments later, Detective Doyle and other members of the surveillance team observed

QUDRAT WAZIRY exit the storage locker carrying a large black plastic bag containing items later

identified to be eight counterfeit purses.  Detective Doyle observed QUDRAT WAZIRY lower the

metal door, lock the storage site and proceed back up the alley to the rear entrance of WAZIR

MARBLE AND GENERAL MERCHANDISE, 1329 4th Street, NE.

      18.    During QUDRAT WAZIRY's absence, UC and the CW engaged in a conversation

with ISMAEL WAZIRY regarding business.  UC also noted that ISMAEL WAZIRY was frequently

distracted by calls received on his cell phone.  Approximately seven minutes after his departure,

QUDRAT WAZIRY reappeared from the rear of the store carrying a black plastic bag containing

eight counterfeit purses which he placed on the floor in front of UC.  Upon his re-entry to the store,

QUDRAT WAZIRY and ISMAEL WAZIRY engaged in a conversation in Farsi.

      19.    While UC inspected the counterfeit Louis Vuitton purses, QUDRAT WAZIRY told

UC to be careful with them, in the sense that re-selling them would be risky.  UC responded that they

would be sold at a purse party and not at the kiosk. UC then asked QUDRAT WAZIRY about Louis

Vuitton wallets. QUDRAT WAZIRY went up into what appeared to be an attic or second floor of

the store and returned a few moments later with a counterfeit Louis Vuitton wallet which he

presented to UC. QUDRAT WAZIRY told UC that he would provide her with a catalogue for her

use in ordering in the future. UC paid QUDRAT WAZIRY $202 in MPD pre-recorded funds which

he again placed in his pocket. QUDRAT WAZIRY provided UC with a receipt for the purchase.

All items purchased during this undercover visit were later inspected by a private investigator from

Blazer Investigations and found to bear counterfeit marks, that is, spurious marks which are identical

with, or substantially indistinguishable from, marks that are registered for those goods on the

principal register in the United States Patent and Trademark Office and are in use, pursuant to Title

18, United States Code, Section 2320.

### 4.    November 2, 2005, Undercover Purchase

20.    On November 2, 2005, UC proceeded to WAZIR MARBLE AND GENERAL

MERCHANDISE, 1329 4th Street, N.E., Washington, D.C., for the purpose of verifying that

counterfeit goods were still being sold from the premises. UC met ISMAEL WAZIRY upon

entering the store and told him UC wanted to purchase Louis Vuitton handbags. ISMAEL WAZIRY

instructed UC to wait and that someone would assist UC soon. QUDRAT WAZIRY appeared and

gave UC some papers showing different Louis Vuitton products. QUDRAT WAZIRY asked UC

to choose which of those products UC wanted to purchase. UC used an eyeliner pencil to place

marks next to each of the products UC chose to buy and told QUDRAT WAZIRY that UC wanted

to purchase twenty handbags. QUDRAT WAZIRY asked UC to wait a moment while QUDRAT

WAZIRY finished with another customer. QUDRAT WAZIRY returned and went over UC's

selections, stating which products WAZIR MARBLE AND GENERAL MERCHANDISE had and did not have. QUDRAT WAZIRY then took the paper and told UC to wait ten minutes. QUDRAT WAZIRY exited the store and entered a gold 2000 Lexus ES300, Virginia license plate number WAZIR1, Vehicle Identification Number JT6HF10U0Y0154091. Surveillance teams followed QUDRAT WAZIRY as he drove to U-Store at 301 New York Avenue, N.E., Washington, D.C. QUDRAT WAZIRY exited his car, entered U-Store, and then returned a short time later, carrying several blue bags containing pocketbooks. QUDRAT WAZIRY placed the blue bags into the Lexus and returned to the store. UC observed QUDRAT WAZIRY enter the store holding the blue bags containing handbags. QUDRAT WAZIRY handed one of the blue bags to UC, stating, "this one is yours." UC examined the contents of the bag and counted thirteen Louis Vuitton handbags. QUDRAT WAZIRY left the store to retrieve additional handbags for UC and was observed by the surveillance team going to the storage facility with the metal garage type door upon which the number "2" was written, located in the alley to the rear of Washington Perfume and Watch Company, 1345 4th Street, NE, Washington, DC., and parallel to 4th Street. QUDRAT WAZIRY returned with numerous Louis Vuitton handbags. UC agreed to purchase some of those bags too for a total of twenty-six Louis Vuitton handbags and in exchange UC paid QUDRAT WAZIRY $560 in MPD funds. All items purchased during this undercover visit were later inspected by a private investigator from Blazer Investigations and found to bear counterfeit marks, that is, spurious marks which are identical with, or substantially indistinguishable from, marks that are registered for those goods on the principal register in the United States Patent and Trademark Office and are in use, in violation of Title 18, United States Code, Section 2320.

### 5.    Surveillance of the Residential Premises

21.     On November 8, 2005, UC conducted surveillance of the home of ISMAEL, QUDRAT, and ABDUL WAZIRY at 7437 Dulany Drive, McLean, Virginia.  At approximately 7:56am, UC observed ABDUL JALIL WAZIRY and QUDRAT WAZIRY exit the home, each carrying 3 or 4 plastic bags similar to those UC observed to contain counterfeit goods in WAZIR MARBLE AND GENERAL MERCHANDISE, 1329 4th Street, N.E., Washington, D.C.  ABDUL JALIL WAZIRY and QUDRAT WAZIRY entered and drove off in a vehicle with the bags.  The vehicle was a Honda Accord automobile, Virginia license plate number JUR5020, Vehicle Identification Number 1HGCM66595A053631, registered to ABDUL JALIL WAZIRY, 7437 Dulany Drive, McLean, Virginia.  At approximately 8:09am, your affiant observed ISMAEL WAZIRY exit the home with 6 Nike tennis shoe boxes which he placed into the Lexus ES300, Virginia license plate number WAZIR1.  As ISMAEL WAZIRY drove away, your affiant followed him long enough to determine that he was headed into the District of Columbia.  Your affiant terminated the surveillance for fear of being detected.

**6.     November 10, 2005, Search and Arrest Warrant Executions**

22.     On November 10, 2005, investigators executed a federal search warrant upon the premises of WAZIR MARBLE AND GENERAL MERCHANDISE, 1329 4th Street, N.E., Washington, D.C., and executed arrest warrants for ISMAEL WAZIRY, QUDRAT WAZIRY, and ABDUL JALIL WAZIRY at the same location.  Upon the execution of the search warrant, Agents seized thousands of counterfeit goods from the premises.  In front of the premises on 4th Street, Agents observed the Honda Accord, Virginia license plate number JUR5020, Vehicle Identification Number 1HGCM66595A053631, previously observed on November 8 at the WAZIRY residence.  In plain view through the closed windows of the automobile were counterfeit products like those

12

found inside WAZIR MARBLE AND GENERAL MERCHANDISE. The goods were on the back seat of the car. Agents seized the Honda Accord, transported it to a secure FBI garage on V Street, N.E., in Washington, D.C., and secured it without conducting a search of the vehicle in order to obtain a search warrant for the car.

### E.    Evidence, Contraband, Fruits and Instrumentalities of Crime

23.    Based upon your affiant's training and experience, upon my participation in investigations of other illegal enterprises engaged in violations of narcotics laws, IRS laws, the Money Laundering Control Act, and related offenses, and upon the training and experience of other investigators participating in this investigation, including, but not limited to, that of Detective Edward Doyle, I know that:

a.    It is common for individuals involved in financial crime, including trafficking in counterfeit goods offenses, to maintain financial documents and records relating to both their personal and business financial affairs. These documents will show their acquisition, conversion, movement, secreting, transfer, and disbursement of currency, currency equivalents, and illegal goods, including counterfeit goods. It is also common for such persons to maintain currency, checks, money orders, credit cards, credit card receipts, or other financial instruments which are the proceeds or facilitating property of the illegal activity. These documents, records, and financial instruments are often retained for long periods of time in secure and accessible locations, including residences, businesses, vehicles, safe deposit boxes, banks, and storage facilities;

b.    In the case of an illegal business enterprise like WAZIR MARBLE AND GENERAL MERCHANDISE, such financial documents and records often include inventory ledgers; purchase orders; confirmation letters; correspondence with co-conspirators; payment or

13

disbursement ledgers; computer documents and/or files; invoices; employee lists and employment information; employee sales records; supplier and delivery records; receipts relating to illegal sales and to the expenditure of proceeds of illegal activities; U.S. Postal Service and/or next day carrier services documents and receipts; supplier, customer and/or co-conspirator telephone number and address listings; customer records; contracts; Rolodex files; photographs and other forms of identification of associates and co-conspirators; appointment books; notes; airline ticket receipts; records of money orders; bank accounts; and financial instruments. All of the foregoing items and information constitute evidence, contraband, fruits, or instrumentalities of violations of Title 18, United States Code, Sections 371 and 2320.

c.    Individuals involved in financial crime, including trafficking in counterfeit goods, create such documents, records, and information by various means, including, but not limited to, computers, printers, telex machines, facsimile machines, currency counting machines, pagers (digital display beepers), and telephones, telephone answering machines, and cameras. These individuals also maintain such documents, records, and information in various forms, including, but not limited to, electrical, magnetic, photographic, and tangible form. The warrant application therefore requests authorization to search for and seize all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any electrical, electronic, or magnetic form (such as any information on an electronic or magnetic storage device, including hard drives, floppy diskettes, ZIP discs, CD-ROMs, optical discs, backup tapes, printer buffers, smart cards, memory calculators, pagers, personal digital assistants such as Palm Pilot computers, as well as printouts or readouts from any magnetic storage device); any handmade form (such as writing, drawing, painting); any mechanical form (such as printing or typing); and any

photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, photocopies).

24.    Your affiant also knows that computer hardware and software, and digitally, electronically, and magnetically stored files and information may be important to a criminal investigation in two distinct ways: (1) the objects themselves may be contraband, evidence, instrumentalities, or fruits of crime, and/or (2) the objects may be used as storage devices that contain contraband, evidence, instrumentalities, or fruits of crime in the form of electronic data. Rule 41 of the Federal Rules of Criminal Procedure permits the government to search for and seize computer hardware and software, and digitally, electronically, and magnetically stored files and information that are evidence of crime, contraband, instrumentalities of crime, or fruits of crime. In this case, the warrant application requests permission to search and seize all computer hardware and software, and digitally, electronically, and magnetically stored files and information within the Honda Accord that constitute or may be contraband, and that constitute or may be evidence, instrumentalities, or fruits of violations, by WAZIR MARBLE AND GENERAL MERCHANDISE and its owners or agents, of counterfeiting offenses involving Title 18, United States Code, Sections 371 and 2320. Based on all of the foregoing facts, your affiant believes that, in this case, computer hardware and software, and digitally, electronically, and magnetically stored files and information on the premises of WAZIR MARBLE AND GENERAL MERCHANDISE constitute evidence, instrumentalities, or fruits of crime.

25.    Individuals involved in the sale of counterfeit products, such as CDs, DVDs, watches, handbags, luggage and other wearing apparel and commodities often sell their product from stores rented by them or from kiosks located in suburban shopping malls.  Often times, they have the

counterfeit goods shipped to their residence via commercial shippers and then remove the

merchandise from the original shipping boxes and containers and transport it to their place of

business where it is sold on the open market. Individuals involved in the sale of counterfeit products

often hide and safeguard contraband by storing their inventory in residences and storage facilities

located away from their primary business. Records pertaining to the rental and lease of storage

facilities used to hide and disguise contraband; records concerning the ordering, purchase, shipment,

storage, inventory, payment and sale of counterfeit goods and apparel; records and documents

reflecting the identity of co-conspirators and associates; and computer hardware and software, and

computer storage devices, used to generate and store such records are frequently located at such

individuals' residences where they are considered safe from theft, damage or discovery.

Furthermore, individuals involved in the sale of counterfeit products often update and enter business

data into their computers during after-work hours in the privacy of their residence, and they often

conduct business transactions, including sending and receiving faxes, sending and receiving email

or other forms of communication regarding the purchase, transportation or sale of counterfeit

products from their residences after normal business hours due to the differences in world times

zones with overseas suppliers, contacts and criminal associates.

26.    Individuals involved in the sale of counterfeit products commonly engage in tax

evasion. Frequently business owners will maintain two sets of books, one recording all cash sales

for their own information and one recording redacted cash sales figures. These monthly ledger

sheets are often provided to bookkeepers and accountants who prepare quarterly sales tax payments

on behalf of the business. Records detailing true sales figures are seldom kept at the business

location. Rather, they are usually kept in office or computer areas in the business owners' residence.

16

27. Individuals involved in the sale of counterfeit products commonly deal in large amounts of cash, much of which must be held in order to structure bank deposits under $10,000. Often this surplus cash is kept in the business owner's residence rather than in an office safe in an unprotected store over night. Individuals involved in financial crime also often use various money laundering schemes to dispose of their criminal proceeds and to facilitate their crimes. They frequently co-mingle legitimate funds with illegitimate funds in an attempt to conceal and disguise their sources of income and they sometimes use a "nominee" or "straw purchaser" to purchase assets.

28. The aforementioned facts provide evidence of probable cause to believe that the commercial retail distributor identified as WAZIR MARBLE AND GENERAL MERCHANDISE, located at 1329 4th Street, NE., Washington, D.C., and its owners and agents, including but not limited to QUDRAT WAZIR, ISMAEL WAZIR, and ABDUL JALIL WAZIR, have conspired to traffic and have intentionally trafficked in goods while knowingly using a counterfeit mark on or in connection with such goods, in violation of Title 18, United States Code, Sections 371 and 2320. Additionally, there is probable cause to believe that evidence, instrumentalities, contraband, and fruits of those violations, as described above and more particularly described in Attachment B, will be found inside the Honda Accord, Virginia license plate number JUR5020, Vehicle Identification Number 1HGCM66595A053631, more particularly described in Attachment A.

29. Based upon my knowledge, training, and experience, as well as information related to me by agents and others involved in the forensic examination of computers, I know that computer data can be stored on a variety of systems and storage devices. I also know that during the search of the premises it is rarely possible to complete on-site examination of computer equipment and storage devices for a number of reasons, including the following:

17

a.    Searching computer systems is a highly technical process which requires specific expertise and specialized equipment. There are so many types of computer hardware and software in use today that it is rarely possible to bring to the search site all of the necessary technical manuals and specialized equipment necessary to conduct a thorough search. In addition, it may also be necessary to consult with computer personnel who have specific expertise in the type of computer, software application or operating system that is being searched.

b.    The best practices for analysis of computer systems and storage media rely on rigorous procedures designed to maintain the integrity of the evidence and to recover "hidden," mislabeled, deceptively-named, erased, compressed, encrypted, or password-protected data while reducing the likelihood of inadvertent or intentional loss or modification of data. A controlled environment, such as a law enforcement laboratory, is typically required to conduct such an analysis properly.

c.    The volume of data stored on many computer systems and storage devices will typically be so large that it will be highly impractical to search for data during the execution of the physical search of the premises. The hard drives commonly included in mere desktop computers are capable of storing millions of pages of text. Additionally, a suspect may try to conceal criminal evidence; he or she might store it in random order with deceptive file names. This may require searching authorities to examine all the stored data to determine which particular files are evidence or instrumentalities of crime. This sorting process can take weeks or months, depending on the volume of data stored, and it would be impractical and invasive to attempt this kind of data search on-site.

30.    In light of these concerns, your affiant hereby requests the Court's permission to seize

the computer hardware, and associated peripherals as discussed below, that are believed to contain some or all of the contraband, evidence, instrumentalities or fruits of crime described in the warrant and to conduct an off-site search of the hardware for such contraband, evidence, instrumentalities or fruits of crime if, upon arriving at the scene, the Agents executing the search conclude that it would be impractical to search the computer hardware on-site.

31.    Based upon my knowledge, training, and experience, as well as information related to me by agents and others involved in forensic examination of computers, I am aware that searches and seizures of evidence from computers taken from the premises commonly require agents to seize most or all of a computer system's input/output and peripheral devices, in order for a qualified computer expert accurately to retrieve the system's data in a laboratory or other controlled environment. Therefore, in those instances where computers are removed from the premises, in order fully to retrieve data from a computer system, investigators must seize all the storage devices, as well as the central processing units (CPUs), and applicable keyboards and monitors which are an integral part of the processing unit. If, after inspecting the input/output devices, system software, and pertinent computer-related documentation, it becomes apparent that these items are no longer necessary to retrieve and preserve the data evidence, and are not otherwise seizeable, such materials and/or equipment will be returned within a reasonable time.

### F.    Analysis of Electronic Data

32.    The analysis of electronically stored data, whether performed on-site or in a laboratory or other controlled environment, may entail any or all of several different techniques. Such techniques may include, but shall not be limited to, surveying various file directories and the individual files that they contain (analogous to looking at the outside of a file cabinet for the

markings it contains and opening a drawer capable of containing pertinent files, in order to locate the evidence authorized for seizure by the warrant); examining all the structured, unstructured, deleted, and overwritten data on a particular piece of media; opening or reading the first few pages of such files in order to determine their precise contents; scanning storage areas to discover and possibly recover recently deleted data; scanning storage areas for deliberately hidden files; and performing electronic key-word searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are intimately related to the subject matter of the investigation.

### G.    Conclusion

33.    Based on the information set forth above, the undersigned affiant submits that there is probable cause to believe that evidence, contraband, fruits, and instrumentalities relating to violations of Title 18, United States Code, Sections 371 and 2320 are located and will be found within the Honda Accord, Virginia license plate number JUR5020, Vehicle Identification Number 1HGCM66595A053631.

Cynthia Paige Pinson
Federal Bureau of Investigation
Special Agent

Sworn to before me and subscribed in my presence this __18__ day of November 2005.

United States Magistrate Judge
District of Columbia

## ATTACHMENT A
### Place or Thing to be searched

An automobile described as a Honda Accord, Virginia license plate number JUR5020, Vehicle Identification Number 1HGCM66595A053631, located in the FBI garage, V Street, N.E., Washington, D.C.

## ATTACHMENT B
### Items to be seized

Items to be seized are the evidence, fruits, instrumentalities, or contraband relating to violations of Title 18, United States Code, Sections 371 and 2320, including but not limited to the following:

A.  RECORDS

1.    Records, documents, and materials containing information of past and present criminal activity involving trafficking or conspiring to traffic in goods while using a counterfeit mark on or in connection with such goods. The terms "records," "documents," and "materials" includes such items in all forms, including paper, photographic, mechanical, electronic, magnetic, and optical forms, or other coding forms on computer media or on media capable of being read by a computer or computer-related equipment, such as fixed hard discs, external hard discs, removable hard discs, floppy diskettes, compact discs (CDs), digital video discs (DVDs), tapes, optical storage devices, laser discs, electronic notebooks, zip disks, printer buffers, smart cards, or other memory storage devices.

2.    Records, documents, and materials that relate to the business of WAZIR MARBLE AND GENERAL MERCHANDISE, to trafficking in counterfeit goods, or to QUDRAT WAZIR, ISMAEL WAZIR, and ABDUL JALIL WAZIR, and that contain, constitute or concern inventory ledgers; purchase orders; confirmation letters; correspondence with co-conspirators; payment or disbursement ledgers; computer documents and/or files; invoices; employee lists and employment information; employee sales records; supplier and delivery records; receipts relating to illegal sales and to the expenditure of proceeds of illegal activities; U.S. Postal Service and/or next day carrier services documents and receipts; real estate and storage facility lease and title documents; supplier, customer and/or co-conspirator telephone or fax number and address listings; customer records; contracts; Rolodex files; keys; photographs and other forms of identification of associates and co-conspirators; appointment books; notes; and airline ticket receipts.

3.    Records, documents, and materials containing, constituting or concerning financial transactions, financial statements, and financial summaries; including bank statements; financial instruments; financial applications; wire transfer records; credit cards; credit card statements and records; ATM access cards; credit reports; social security cards; accounting records; money orders; checks; tax records; ledgers; and journals.

4.    Records, documents, and materials that relate to the business of WAZIR MARBLE AND GENERAL MERCHANDISE, to trafficking in counterfeit goods, or to QUDRAT WAZIR, ISMAEL WAZIR, and ABDUL JALIL WAZIR, and that contain, constitute or concern identification, foreign or domestic travel, or occupancy, residency, and ownership, such as driver's licenses; passports; visas; airline tickets; social security documents; mail; utility records; telephone records; and mortgages, deeds, and lien records.

B.  HARDWARE

5.      Computer hardware, which can collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, optical, or similar computer impulses or data. Hardware includes any data-processing devices (such as central processing units, memory typewriters, Personal Data Assistants (PDAs), and self-contained "laptop" or "notebook" computers); internal and peripheral storage devices (such as fixed disks, external hard disks, floppy disk drives and diskettes, removable magnetic disk storage drives and disks, tape drives and tapes, optical storage devices, transistor-like binary devices, and other memory storage devices); peripheral input/output devices (such as keyboards, printers, scanners, plotters, video display monitors, and optical readers); and related communications devices (such as modems, cables and connections, and RAM or ROM units,); as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (such as physical keys and locks).

C.     SOFTWARE

6.      Computer software consisting of digital information which can be interpreted by a computer and any of its related components to direct the way they work; in whatever form it may be found, to include: electronic, magnetic, optical, or other digital form, in addition to printed source code. Software includes, but is not limited to: any programs to run operating systems, control peripheral equipment, applications, utilities, scripts, compilers, interpreters, and communications programs; any programs, whether functional or not, to assist in the defeat of security/protective feature in place to prevent the unauthorized copying, distribution, and/or activation of software; along with any and all programs necessary for the proper functioning of this software.

D.     PASSWORDS, DATA SECURITY DEVICES, AND COMPUTER DOCUMENTATION

7.      Computer passwords and other data security devices that are designed to restrict access to or hide computer software, documentation, or data. Data security devices may consist of hardware, software, or other programming code. A password (a string of alpha-numeric characters) usually operates as a sort of digital key to "unlock" particular data security devices. Data security hardware may include encryption devices, chips, and circuit boards. Data security software or digital codes may include programming code that creates "test" keys or "hot" keys, which perform user-defined security-related functions when activated. Data security software or code which might also encrypt, compress, hide or "booby-trap" protected data to make it inaccessible or unreadable as well as reverse the process to restore the data. Computer passwords may be stored in electronic media or written down on ledgers, books, papers, etc.

8.      Computer-related documentation consisting of written, recorded, printed, or electronically stored material which explains or illustrates how to configure or use the computer hardware, software, or other related items.

E.     COUNTERFEIT GOODS AND RELATED EQUIPMENT, DEVICES AND MATERIALS

9.      All apparel or other items, including but not limited to purses, handbags, wallets,

2

belts, scarfs, glasses, or hats that bear, or that appear to be possessed with the intent to affix, counterfeit marks; any unaffixed marks such as labels, logos, or identifying containers, documentation or packaging; and any tools, equipment, devices or materials for use in the manufacture, preparation, creation, or distribution of counterfeit goods or counterfeit marks.